# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| INEZ DERDEN<br>P.O. Box 90304<br>Washington, D.C. 90304, | : | Case No. |
| | : | Judge |
| Plaintiff, | : | Magistrate Judge |
| v. | : | |
| CITY OF CINCINNATI<br>Law Department<br>801 Plum Street<br>Cincinnati, Ohio 45202 | :<br><br>: | |
| and | : | |
| | : | |
| DET. NEDRA WARD<br>c/o Cincinnati Police Department<br>District 4<br>4150 Reading Road<br>Cincinnati, Ohio 45229 | :<br><br>:<br><br>: | **COMPLAINT AND<br>JURY DEMAND** |
| and | : | |
| | : | |
| P.O. LINDA SELLERS<br>c/o Cincinnati Police Department<br>District 2<br>3295 Erie Avenue<br>Cincinnati, Ohio 45208 | :<br><br>:<br><br>: | |
| and | : | |
| | : | |
| JOHN & JANE DOES 1-5<br>c/o City of Cincinnati Law Dept.<br>801 Plum Street<br>Cincinnati, Ohio 45202 and<br>c/o Cincinnati Police Department<br>310 Ezzard Charles Drive<br>Cincinnati, Ohio 45214 | :<br><br>:<br><br>:<br><br>: | |
| Defendants. | : | |

The plaintiff Inez Derden, through counsel and for her complaint, states the

following:

## Nature of Action

1. The plaintiff Inez Derden brings this action against the defendants for violation of her civil rights under color of state law. Ms. Derden brings her claims under 42 U.S.C. §§ 1983 and 1988 for violation of her rights under the First, Fourth, and Fourteenth Amendments to the Constitution of the United States.

2. Ms. Derden seeks compensatory damages from all defendants in excess of $250,000.00, punitive damages from the defendants Ward and Sellers in excess of $500,000.00, together with costs and attorney's fees, all in amounts to be determined at trial.

## Jurisdiction and Venue

3. This Court has jurisdiction over Ms. Derden's claims under 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights).

4. All of the events giving rise to this lawsuit occurred, and all of the defendants reside, within the Southern District of Ohio, Western Division. Venue is therefore proper under 28 U.S.C. § 1391.

## Parties

5. The plaintiff Inez Derden currently resides in Washington, D.C., but at all times material to this complaint resided in the City of Cincinnati, within the geographic limits of the City of Cincinnati Police District 4.

6. The defendant City of Cincinnati is a municipal corporation and a "person" amenable to suit under 42 U.S.C. § 1983.

7. The defendant Det. Nedra Ward is a citizen and resident of Hamilton County, Ohio,

within the Southern District of Ohio, Western Division. The defendant Ward is a Detective with the City of Cincinnati Police Department, and participated with the defendant P.O. Linda Sellers in committing the acts of misconduct giving rise to this lawsuit. Ms. Derden brings this suit against the defendant Ward individually, and in her official capacity as a Detective with the City of Cincinnati Police Department.

8. The defendant P.O. Linda Sellers is a citizen and resident of Hamilton County, Ohio, within the Southern District of Ohio, Western Division. The defendant Sellers is a Police Officer with the City of Cincinnati Police Department, and participated with the defendant Ward in committing the acts of misconduct giving rise to this lawsuit. Ms. Derden brings this suit against the defendant Sellers in her individual capacity, and in her official capacity as a Police Officer acting on behalf of the City of Cincinnati.

9. The defendants John & Jane Does 1-5 are City of Cincinnati police officers or other City of Cincinnati officials whose identities are presently unknown to Ms. Derden, but who either (a) personally participated with the defendants Ward or Sellers as alleged in this complaint; (b) authorized, approved, knowingly acquiesced in, or ratified the wrongful conduct of the defendants Ward and Sellers; or (c) established or implemented policies being carried out by the defendants Ward and Sellers in committing their wrongful conduct.

## Factual Summary

10. Ms. Derden is married to an employee within the City of Cincinnati safety services, who shall be unnamed in this complaint, but will be identified to all defendants in Ms. Derden's initial disclosures under Fed. R. Civ. P. 26(a).

11. Ms. Derden's husband suffers from a bipolar disorder.

12. Ms. Derden's husband has engaged in a long pattern and history of domestic violence

and abuse against Ms. Derden, principally when he goes off of his medication and his illness causes him to suffer lapses from reality, and violent or suicidal thoughts. This long pattern and history of domestic violence and abuse by Ms. Derden's husband against Ms. Derden dates back at least to the early to mid-2000s.

13. Ms. Derden has, over the past several years, made numerous calls to 911 to report her husband's ongoing or threatened domestic violence and abuse against her, or his threatening or suicidal behavior.

14. The police have frequently responded to Ms. Derden's calls for help, but have always taken her husband's side.

15. Ms. Derden has, in addition, made numerous calls and written contacts with officials for the City and the City department her husband works in, begging them to require her husband to obtain psychiatric treatment through his work health benefit plan, or as a condition of his continued employment.

16. The City officials whom she has contacted have repeatedly rebuffed her efforts to get mental health assistance or treatment for her husband.

17. Ms. Derden came to believe that the City was more interested in protecting her husband as one of its own employees, than in protecting her safety.

18. Ms. Derden on several occasions dealt with Detective Ward and Officer Sellers in making her complaints to the police about her husband's mental condition, acts of domestic violence and abuse, and threats of harm or self-harm.

19. Rather than taking Ms. Derden's threats seriously, the defendants Ward and Sellers warned Ms. Derden to stop bothering them with reports of abuse by her husband, or his homicidal or suicidal ideations.

20. On March 18, 2015, Ms. Derden called 911 to report yet another act of domestic violence against her committed by her husband.

21. On March 19, 2015, Ms. Derden spoke with the defendant Ward about the previous day's incident of domestic violence. The defendant Ward was clearly irritated at having to investigate Ms. Derden's report. The defendant Ward complained that Ms. Derden was putting the burden of investigation on her, and that she had to make sure that she didn't take away Ms. Derden's husband's freedom.

22. On April 8, 2015, Ms. Derden went to District 4 to follow up on her complaint. The defendant Ward said that an independent witness had said that Ms. Derden was the aggressor, and that no warrant would be issued for her husband's arrest. The defendant Ward refused to say who the independent witness was, and Ms. Derden does not believe there was any such independent witness.

23. Ms. Derden asked to speak to the defendant Ward's supervisor. Ms. Derden complained to the defendant Ward's supervisor, whose last name is Hammer, about the defendant Ward's refusal to bring charges against her husband, and the police department's continued protection of her husband from prosecution. Ms. Derden believed that her life and safety were being jeopardized by the City's failure to act. The defendant Ward's supervisor confirmed that no charges would be brought against Ms. Derden's husband.

24. Ms. Derden then sought to raise her concerns for her safety and the police department's inaction to the next higher authority within the department, Captain Herold. Captain Herold did not return Ms. Derden's call.

25. Ms. Derden, however, was referred to a domestic violence investigator within the police department, the defendant Sellers.

5

26.     Ms. Derden met with the defendant Sellers on April 9, 2015 at the District 2 police station.

27.     The defendant Sellers had obviously been prepped in advance about Ms. Derden, and demanded either that Ms. Derden herself go downtown to fill out paperwork to get a temporary protective order against her husband, or else, the defendant Sellers warned, the police would hold Ms. Derden responsible and arrest her for making false reports about her husband.

28.     Ms. Derden left the District 2 station and went to 800 Broadway to fill out the paperwork for a TPO, and did so, but was unable to obtain a TPO that day.  Ms. Derden called the defendant Sellers to let her know she was unable to get a TPO that day, and the defendant Sellers became angry, and berated her.

29.     On April 11, 2015, Ms. Derden's husband contacted the defendant Sellers on her personal cell phone, and accused Ms. Derden of stealing or using his car, a Toyota, without his consent.

30.     Ms. Derden is a registered owner of the Toyota, and her name was on the title.  Ms. Derden didn't steal or need consent to drive her own car.

31.     Nevertheless, the defendant Sellers immediately called Ms. Derden on her cell phone, and demanded that she get out of the Toyota, leave it wherever it then was, and come to the District 2 station for processing. The defendant Sellers told Ms. Derden that a warrant had been issued for her arrest.

32.     Ms. Derden protested, but complied with the defendant Sellers' request.

33.     When Ms. Derden arrived at the District 2 station, the defendant Sellers gave her a choice: be arrested and taken to jail; or go with the defendant Sellers to be checked into the

University Hospital Psychiatric Emergency Services (UC PES) on an involuntary psychiatric hold.

34.     To avoid being immediately arrested and jailed, Ms. Derden chose to be taken by the defendant Sellers to UC PES.

35.     The defendant Sellers had no probable cause to believe that Ms. Derden was mentally ill or that Ms. Derden posed any threat to her own safety or the safety of others. The defendant Sellers took Ms. Derden to UC PES for admission as a mentally ill person simply in order to punish Ms. Derden from making her repeated complaints and reports of her husband's very real acts of domestic violence, and his very real homicidal and suicidal ideations.

36.     The police, in short, and Detective Ward and Officer Sellers in particular, did not want to be bothered anymore with having to listen to and investigate Ms. Derden's complaints and reports of abuse.

37.     Ms. Derden was examined at UC PES, deemed not to be mentally ill or a threat to herself or others, and was promptly released.

38.     Ms. Derden then complained to Cincinnati Police Captain Herold again about the defendant Sellers' improper conduct, but again received no return phone call.

39.     In early May, 2015, Ms. Derden's husband began telephoning Ms. Derden, and leaving bizarre and incoherent messages threatening Ms. Derden and others.  Ms. Derden had told her husband that she was going to meet with the Police Chief to have him arrested, or to get him the mental health help he needs.  In one message, her husband told her to shoot the Police Chief during her meeting.

40.     Ms. Derden reported the threatening calls to the police, and was informed that the

defendant Sellers was the only one who would help her. Ms. Derden went to the District 2 police station, and played the threatening phone messages for the defendant Sellers and two other police officials. Ms. Derden told them that her husband was mentally ill and in crisis, and needed psychiatric help.

41. The defendant Sellers left Ms. Derden in the waiting room area for about 45 minutes to an hour while she was supposedly looking for some help for Ms. Derden's husband.

42. Instead, the defendant Sellers was filling out paperwork to have Ms. Derden involuntarily committed to UC PES on another psychiatric hold.

43. On May 14, 2015, the defendant Sellers took Ms. Derden into custody, placed her in the back of a police cruiser, and delivered her to UC PES. The defendant Sellers wrote on the UC PES involuntary psychiatric hold paperwork that "Ms. Derden has caused a substantial risk of violating the rights of others by constantly calling police and other agencies . . . because she says her husband wants her to shoot the police chief. Ms. Derden is consumed with getting her husband arrested or mentally committed in the hospital."

44. The defendant Sellers met with the admitting doctor before he met with Ms. Derden, and convinced the doctor: (a) that the police had thoroughly investigated all of Ms. Derden's complaints, when they had not; (b) that Ms. Derden's complaints against her husband were all in her imagination, which they were not; and (c) and that Ms. Derden was mentally ill, which she was not.

45. The doctor then interviewed Ms. Derden and, having been prepped beforehand that everything Ms. Derden would tell him was false, concluded that she was delusional. The doctor noted that Ms. Derden had been brought in by the police "because of her bizarre behavior," and that she "clearly has a mood disorder and a delusional disorder."

8

46. Ms. Derden was held for five days against her will, until May 18, 2015. UC PES had determined once again that Ms. Derden was not mentally ill and posed no threat to herself or others, and released.

47. This pattern of threats, assaults, reports, and police disbelief continued until January 23, 2016.

48. In the years leading up to that date, Ms. Derden's husband had variously choked her, pushed her, grabbed her, thrown bleach on her, threatened to kill her, threatened to kill himself, and had threatened to kill others who might try to help her. Ms. Derden reported each of these instances to the police, and begged them to help her.

49. On several occasions, Ms. Derden sought and received medical treatment for her injuries, and to document her husband's attacks.

50. Mr. Derden taunted her to go ahead and call the police, because he knew the police would always take his side of any story, and would never believe her if he simply denied her complaints to them. He knew he would be protected as a City employee.

51. On January 23, 2016, Ms. Derden's husband came to Ms. Derden's house (the couple was separated at the time), pushed his way in the front door, and began chasing Ms. Derden.

52. Ms. Derden had been afraid of her husband attacking her, and kept a personal protection Mace sprayer out in the open and ready for use. Ms. Derden ran to get the Mace sprayer, but her husband caught her just as she reached for it. Mr. Derden grabbed her by the throat, while Ms. Derden grabbed the Mace and tried to spray him with it.

53. In her haste and in the scuffle, though, she missed, and the Mace filled the air around them. Mr. Derden let her go and ran out of the house. Ms. Derden called 911, and had to

exit her home as she was calling, as she began choking on the Mace that filled the air inside.

54. The police responded to investigate, and Ms. Derden explained to them what happened. The police, however, made no immediate attempt to locate or question her husband. The responding officers' reports were referred back to the defendant Ward.

55. The following Monday, January 25, 2016, Ms. Derden's husband assaulted her in the Oakley Kroger parking lot. Ms. Derden had Kroger security call 911, and District 2 Officers responded.

56. No arrests were made that day, and the investigation was referred back to the defendant Sellers.

57. Upon receipt of this new report of domestic violence by Ms. Derden against her husband, the defendants Ward and Sellers, and potentially the defendants John & Jane Does 1-5, conferred and collaborated on a plan to protect Ms. Derden's husband, and to punish Ms. Derden for her repeated complaints. The defendants Ward and Sellers, and potentially the defendants John & Jane Doe 1-5, sought to discourage and prevent Ms. Derden from making any more reports of domestic violence against her husband so that they would not have to be bothered investigating them anymore.

58. On January 25, 2016, the defendant Sellers again signed paperwork to have Ms. Derden involuntarily committed to UC PES on an emergency psychiatric hold. The defendant Sellers said this was justified because Ms. Derden "has continued to abuse public service agencies such as the police department, the fire department, city hall, and government agencies by stating her husband is abusing her and there is no evidence of it . . ."

59. Ms. Derden was then taken a third time against her will to UC PES, where she was

held for two days, examined, and released as no threat to herself or others.

60.   The examining doctor made this written statement to the police:

To Whom It May Concern:

\*         \*         \*         \*

Ms. Derden was brought to our hospital on a psychiatric statement of belief by CPD officers purportedly for making allegations of abuse against her husband . . . and harassing him. The situation was presented to our staff officers as though there was no evidence for the abuse. . . and that [her] behavior was driven by mental illness.

After a thorough psychiatric evaluation, review of her medical records, and discussion of her past and present behavior with her family and her primary care physician, I can say there is no evidence that Ms. Derden suffers from a major mental illness, and in particular there is no evidence whatsoever that she is psychotic or delusional. Objectively, she displays no symptoms or signs consistent with major mental illness. Moreover, both years' worth of medical records from her primary care physician, and information obtained from two of her sisters clearly indicates that domestic violence perpetrated by [Ms. Derden's husband] has been ongoing for years.

\*         \*         \*         \*

Frankly, it is an outrage that this woman was brought to a psychiatric hospital for her concerns. There is evidently a suggestion that Ms. Derden is bringing complaints to the attention of police too often. . . Her complaints need to be taken seriously and investigated thoroughly, . . . and not something to be "fixed" by attempting to treat Ms. Derden as though she is mentally ill and out of touch with reality. . .

61.   Ms. Derden complained to police department, fire department, and City administration officials about her endangerment, mistreatment, and false imprisonment by the defendants Ward and Sellers.

62.   On January 27, 2016, the defendant Ward filled out a criminal complaint against Ms. Derden in retaliation for Ms. Derden's repeated complaints to the police and City officials about her husband's assaults, threats, and acts of domestic violence. The defendant Ward

11

charged Ms. Derden with domestic violence against Mr. Derden. The defendant Ward also filed a motion requesting the Court to issue a domestic violence protective order against Ms. Derden, ostensibly for the protection of her husband, but in reality so that they could arrest her if she made any further reports or complaints to police or other city officials about her husband's assaults or mental instability.

63. On February 3, 2016, the defendant Ward caused Ms. Derden to be physically arrested, and taken to the Hamilton County Justice Center, where she was held pending bond.

64. The defendant Ward charged that Ms. Derden had assaulted her husband with Mace on January 23, 2016, when in fact Ms. Derden had defended herself with Mace from when her husband assaulted her and tried to choke her in her own home.

65. The defendant Ward had again turned events around to protect Ms. Derden's husband, and to place the blame on Ms. Derden instead.

66. The false charge was tried to the Hamilton County Municipal Court, following which Ms. Derden was acquitted, and all charges against her dismissed.

67. In the meanwhile, however, Ms. Derden had been falsely arrested; held overnight in the Hamilton County Justice Center; released on bond, but on condition that she submit to electronic monitoring; maliciously and abusively prosecuted; tried and acquitted; and forced to endure substantial humiliation, distress, and public embarrassment.

## Count One

### Violation of Civil Rights by Defendants Ward and Sellers
### 42 U.S.C. § 1983

68. Ms. Derden incorporates each of the foregoing allegations as if fully restated herein.

69. Ms. Derden has clearly recognized rights under the First, Fourth, and Fourteenth Amendments to the U.S. Constitution to petition public authorities for redress of grievances, to be free from unreasonable deprivations of liberty, and to enjoy due process and equal protection under the laws.

70. The defendants Ward and Sellers, acting in both their official and individual capacities, violated these clearly established rights by conspiring together to punish and retaliate against Ms. Derden by the following means for her complaints about domestic violence and abuse as more fully set forth above.

71. The defendants Ward and Sellers violated these clearly established rights by falsely attesting that Ms. Derden was mentally ill and in need of involuntary psychiatric hold.

72. The defendants Ward and Sellers violated these clearly established rights by depriving Ms. Derden, or causing Ms. Derden to be deprived of liberty by the successive psychiatric holds as set forth above.

73. The defendants Ward and Sellers violated these clearly established rights by arresting Ms. Derden, or causing her to be arrested and jailed, on fabricated and unwarranted charges of domestic violence.

74. The defendants Ward and Sellers violated these clearly established rights by conspiring together and instigating the criminal prosecution of Ms. Derden on fabricated and unwarranted charges of domestic violence.

75. The defendants violated these clearly established rights by denying Ms. Derden the equal protection of the laws, and by favoring her City-employed husband over her in every instance in which she called or reported his acts or threats of violence and physical abuse.

76. The defendants John & Jane Does 1-5, acting in their individual and official

13

capacities, actively assisted or personally participated with the defendants Ward and Sellers in violating Ms. Derden's clearly established Constitutional rights; (b) authorized, approved, knowingly acquiesced in, or ratified the wrongful conduct of the defendants Ward and Sellers; or (c) established or implemented policies being carried out by the defendants Ward and Sellers in committing their wrongful conduct.

77. As a direct and proximate result of the defendants' violation of Ms. Derden's clearly established Constitutional rights, Ms. Derden has been damaged in an amount to be determined at trial, but in excess of $250,000.00.

78. The defendants Sellers and Ward, and potentially some or all of the John & Jane Doe defendants, acted in their individual capacities with willful and malicious intent to punish and cause harm to Ms. Derden, and with reckless or callous indifference to her rights, such that the imposition of punitive damages against them in their individual capacities is warranted. Ms. Derden is entitled to punitive damages in an amount to be determined at trial, but in excess of $500,000.00.

79. In addition, Ms. Derden is entitled to recover costs and expenses of this action, including reasonable attorney's fees, under 42 U.S.C. § 1988.

## Count Two

### Claims Against the City of Cincinnati, and Official Capacity Claims Against All Individual Defendants
### 42 U.S.C. §1983

80. Ms. Derden incorporates each of the foregoing allegations as if fully restated herein.

81. The defendants John & Jane Does 1-5 are City of Cincinnati police officers or other City of Cincinnati officials whose identities are presently unknown to Ms. Derden, but who either (a) authorized, approved, knowingly acquiesced in, or ratified the wrongful conduct

committed by the defendants Ward and Sellers; (b) authorized, approved, knowingly acquiesced in, or ratified City customs, practices or policies of protecting City safety service employees against citizen complaints of improper or illegal conduct; or (c) established or implemented policies of protecting City safety service workers that the defendants Ward and Sellers were following and carrying out in committing their wrongful conduct.

82. The defendants Ward and Sellers acted also in their official capacities in following and carrying out the official City custom, practice, or policy of protecting City safety service employees against citizen complaints of improper or illegal conduct.

83. This custom, practice, and policy of protecting City employees against citizen complaints of improper or illegal conduct was substantially certain to result in the violation of the complaining citizens' clearly established Constitutional rights under the First, Fourth and Fourteenth Amendments to the U.S. Constitution.

84. This custom, practice, and policy of protecting City employees against citizen complaints of improper or illegal conduct did result in the violation of Ms. Derden's clearly established Constitutional rights under the First, Fourth and Fourteenth Amendments to the U.S. Constitution.

85. As a direct and proximate result of the defendants' violation of Ms. Derden's clearly established Constitutional rights, Ms. Derden has been damaged in an amount to be determined at trial, but in excess of $250,000.00.

86. In addition, Ms. Derden is entitled to recover costs and expenses of this action, including reasonable attorney's fees, under 42 U.S.C. § 1988.

## Prayer for Relief

WHEREFORE, the plaintiff Inez Derden prays for judgment and relief against the defendants, jointly and severally, and an award of compensatory damages against them in an amount to be determined at trial, but in excess of $250,000.00.

In addition, the plaintiff Inez Derden prays for judgment and relief against the defendants Sellers and Ward in their individual capacities, jointly and severally, and an award of punitive damages against them in an amount to be determined at trial, but in excess of $500,000.00.

And finally, the plaintiff Inez Derden requests that she be awarded all allowable costs and expenses of prosecuting this action, including an award of attorney's fees, together with any and all other relief to which she may be entitled.

## Jury Demand

The plaintiff Inez Derden hereby demands a jury trial upon all issues in this case.

Respectfully submitted,

*/s/ Kenneth G. Hawley*
Kenneth G. Hawley (0031772)
HAWLEY LAW CO., LPA
810 Sycamore Street, 5th Floor
Cincinnati, Ohio 45202
T: (513) 338-5640
F: (513) 579-8703
ken@hawleylawco.com

*Attorney for Plaintiff Inez Derden*